**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

AKSHAR PATEL,

     *Plaintiff*,

v.

TODD M. LYONS, Acting Director, U.S.
Immigration and Customs Enforcement,

     *Defendant*.

Case No. 25-cv-01096 (ACR)

---

**MEMORANDUM OPINION**

In 1772, a (future) Founding Father born in St. Kitts and Nevis arrived in the thirteen colonies and proceeded to study on a scholarship at King's College in New York City.[1]  In the two-and-a-half centuries since, countless foreigners have studied at our country's institutions of higher learning.  Our country is richer—figuratively and literally—for their attendance: they have enriched our campus cultures, contributed billions to our economy, and helped shape our government and industries.[2]

Plaintiff Akshar Patel, an Indian national who studied Information Systems at the University of Wisconsin–Milwaukee (UWM), is such a student.  In April 2025, one last exam stood between Patel and graduation.  One last exam, that is, and Defendant U.S. Immigration

---

[1] His name is Alexander Hamilton.  For more information on how he grew up to be a hero and a scholar, the Court commends to the reader Lin-Manuel Miranda, *Hamilton: An American Musical* (Richard Rodgers Theater) and Ron Chernow, *Alexander Hamilton* (2004).

[2] During the 2024 to 2025 academic year alone, foreign higher-education students in the United States "contributed $42.9 billion . . . to the U.S. economy" and "supported 355,736" jobs. NAFSA: Association of International Educators, *NAFSA International Student Economic Value Tool*, https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2 [https://perma.cc/Q37Y-VDBM].

and Customs Enforcement (ICE).  That spring, as part of its newly minted "Student Criminal Alien Initiative," ICE ran the names of approximately 1.3 million student immigrants through the National Crime Information Center (NCIC).  ICE then switched the student entry for any NCIC hit from "active" to "terminated" in the Student and Exchange Visitor Information System (SEVIS)—purportedly, as in Patel's case, for "failing to maintain status."  Dkt. 2-5 (cleaned up).

This was no small change.  Terminating a foreign student's SEVIS record obligates the individual to discontinue his education and leave the country post haste.  But in purging the SEVIS records, ICE overlooked a key fact: the NCIC includes hits for foreign students who do *not* have criminal convictions and thus had *not* failed to maintain status.  Patel, for example, appears in the database because of a reckless-driving arrest (for speeding) even though the prosecution dropped charges.  *See* Dkt. 17 at 25; Dkt. 2-4.  Ignoring that context, ICE treated Patel's entry as a "positive criminality hit[]" and terminated Patel's SEVIS record—without any notice to Patel.  Dkt. 18 at 5; *see also* Dkt. 2-5 (record of Patel's SEVIS termination citing that he was "identified in [a] criminal records check").  Hundreds (potentially thousands) of other foreign students faced the same abrupt SEVIS termination.

In response, scores of foreign students filed suits across the country to reactivate their SEVIS records.  Here, Patel filed an Application for Temporary Restraining Order (TRO), contending that ICE's actions violated the Administrative Procedure Act (APA) and the Due Process Clause of the U.S. Constitution and seeking an injunction to compel his SEVIS record restored to "active status."  The Court granted the motion and entered a TRO.  Dkt. 11.  Rather than defend itself further, ICE restored Plaintiff's record to "active" status and represented that

it planned for Patel's record to "remain active in SEVIS" absent new information.  Dkt. 18 at 39.

The Government has since moved to dismiss the case as moot.  It claims, in effect, no harm, no foul—Patel wanted his SEVIS record reactivated, it is reactivated.  End of story.  But Plaintiff is not reassured.  He highlights that ICE can change its mind anytime and so again terminate his status without notice.  Concerned that past is prologue, he has moved the Court to rule on summary judgment that ICE violated the APA and Due Process Clause and to enjoin it from doing so again.

The Court agrees with Plaintiff.  ICE has not carried its burden, under the voluntary-cessation doctrine, of demonstrating that this case is moot.  Further, the termination of Plaintiff's SEVIS record was arbitrary and capricious in violation of the APA.  Accordingly, the Court DENIES Defendant's Motion to Dismiss, Dkt. 26; and GRANTS Plaintiff's Motion for Summary Judgment, Dkt. 28.  It enters an injunction in the Order accompanying this Memorandum Opinion.

## I.    BACKGROUND

### A.  F-1 Nonimmigrant Status and SEVIS

The relevant events occurred during Plaintiff's final undergraduate semester at UWM.[3] Dkt. 18 at 43–44.  Plaintiff studied there under the Immigration and Nationality Act, 8 U.S.C.

---

[3] Home of the beloved Buckingham U. Badger, or Bucky Badger for short.  The name "Bucky" apparently comes from song lyrics that encouraged the football team to "buck right through that line." *Bucky Badger—A Historical Look Back*, Univ. of Wis., https://uwbadgers.com/sports/2019/2/14/bucky-badger-a-historical-look-back [https://perma.cc/6FJN-6TQA].  Wisconsin gained the nickname "the Badger State" not from the industrious animal, but from its association with lead miners in the 1820s. *Id.*  Without shelter in the winter, the miners "lived like Badgers" in tunnels burrowed into hillsides. *Id.*

ch. 12, which permits foreign nationals to enroll in approved universities as "F-1" status-

holding "nonimmigrant[s]"—so called because they retain a permanent "residence in a foreign

country which" they have "no intention of abandoning," *id*. § 1101(a)(15)(F)(i).  Thus, F-1

students may only remain "temporarily" in the United States while (1) "pursu[ing] a full course

of study" at a certified educational institution, *id*.; or (2) "engaging in authorized practical

training following completion of studies," 8 C.F.R. § 214.2(f)(5)(i).[4]

SEVIS is "the definitive record" of "status and visa eligibility" for F-1 status-holders like

Plaintiff.  9 Foreign Affairs Manual § 402.5-4(B); *see also* 8 U.S.C. § 1372(a)(1).  Universities

make periodic reports within SEVIS of foreign students' relevant biographical information and

academic progress.  *See* 8 U.S.C. § 1101(a)(15)(F)(i); 8 C.F.R. § 214.3(g)(2)(iii).  These updates

aid the Government in taking "appropriate enforcement" action against student "status violators,"

including by terminating their F-1 status pursuant to 8 C.F.R. § 214.1.[5]

An individual may lose F-1 status before the completion of his studies for reasons set

forth in 8 C.F.R. § 214.1(d)–(g).  The reasons fall into two categories: because the student fails

to maintain status or because the Government initiates a termination of status.  An F-1 student

fails to maintain his status if, among other reasons, he commits a "crime of violence for which a

sentence of more than one year imprisonment may be imposed."  *Id*. § 214.1(g).  Government-

initiated terminations, meanwhile, may proceed as follows: (1) "by the revocation of a

---

[4] This case does not implicate a closely related concept—a student visa.  A visa is the document that permits entry into the United States.  Plaintiff, as an F-1 status-holder, may remain in the country even though his visa has expired.  *See* Dkt. 18 at 17–18.  But without a valid visa, he cannot reenter the United States if he departs.  *See* U.S. Customs & Immigr. Enf't, *Students and Employment*, https://www.uscis.gov/working-in-the-united-states/students-and-exchange-visitors/students-and-employment [https://perma.cc/F5N3-3FA8].

[5] U.S. Immigr. & Customs Enf't, *Student and Exchange Visitor Program*, https://www.ice.gov/sevis [https://perma.cc/TZ2R-9VGZ].

[statutory] waiver"; (2) "by the introduction of a private bill to confer permanent resident status

on" the non-citizen; or (3) "pursuant to notification in the Federal Register, on the basis of

national security, diplomatic, or public safety reasons." *Id*. § 214.1(d).  Here, it is undisputed

that Patel did not fall into the first category, *id*. § 214.1(g), and that ICE did not follow any of

the mechanisms set forth in the second, *id*. § 214.1(d).

### B.  Plaintiff's Immigration Status

Plaintiff first arrived in the United States on an H-4 visa issued to him in 2017 as a

dependent of an individual with an H-1B visa.[6]  *See* Dkt. 13-2 at 2.  In 2018, he matriculated to

UWM, where he began pursuing a bachelor's degree in Information Science.  Dkt. 2-3 ¶ 3.

In November 2018, police in Montgomery, Texas, arrested Plaintiff for speeding, a

reckless-driving offense in Texas.  *See id*. ¶ 10; Dkt. 2-4.  The district attorney dismissed the case

in February 2019, and he was never tried or convicted of any crime.  *See* Dkt. 2-4.  In June 2019,

Plaintiff disclosed his arrest when applying for an H-4 extension.  Dkt. 2-3 ¶ 13.  The

Government took note, asking him to provide all relevant documentation concerning the

incident.  *Id*.  After Plaintiff did so, the Government granted his H-4 extension.  *Id*.  In April

2021, on a return trip from India, Plaintiff faced no difficulty entering the United States on a B

visa.  *Id*. ¶ 14.  And in 2022, the Government accepted Plaintiff's application to change his status

to F-1, notwithstanding his arrest record.  *Id*. ¶ 15.  Except for the period in which ICE

---

[6] The United States issues H-1B visas to certain individuals "perform[ing] services in a specialty occupation, services of exceptional merit and ability relating to a Department of Defense (DOD) cooperative research and development project, or services as a fashion model of distinguished merit or ability."  U.S. Citizenship & Immigr. Servs., *H-1B Specialty Occupations*, https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations [https://perma.cc/JM6S-LB8S].

terminated his SEVIS record, *see infra* pp. 8–9, Plaintiff has held F-1 status continuously since June 2022, *see* Dkt 13-2 at 1.[7]

In spring 2025, following the restoration of his SEVIS record, Plaintiff graduated from UWM. He currently remains in the United States under the post-graduate Optional Practical Training program, during which time he remains an F-1 status-holder. *See* 8 C.F.R. § 214.2(f)(5)(i), (f)(10)(ii)(C); Dkt. 37. As a result, he continues to appear in the SEVIS database.[8]

## C. ICE Terminates SEVIS Records En Masse

In spring 2025, ICE's leadership commenced its so-called Student Criminal Alien Initiative by running the name of every foreign student—approximately 1.3 million individuals—through the National Crime Information Center. Dkt. 18 at 3–5, 9. Despite its name, the NCIC includes persons without any criminal convictions. *Id.* at 6. It includes, for example, persons who have been arrested, but not tried or convicted and, *inter alia*, missing persons. *Id*. For that reason, the Assistant Director of the National Security Division for Homeland Security Investigations within ICE has conceded that it is inappropriate to terminate SEVIS records based on an NCIC hit alone. *Id*. at 7.

After running its search, ICE culled from the NCIC database a list of 6,400 students with supposed "positive criminality hits." *Id*. at 5, 12–13. The Administrative Record of what happened next comprises three emails. *See* Dkt. 17. ICE emailed the list it had created, in batches, to the U.S. Department of State (State Department or State). *See* Dkt. 18 at 11–13.

---

[7] ICE has since represented that its restoration of Plaintiff's SEVIS record to "active" "is . . . retroactive to the date of its initial termination such that there is no gap in [Plaintiff's] SEVIS record." Dkt. 26-2 ¶ 7.

[8] Foreign vocational students and exchange visitors also have SEVIS records. 8 U.S.C. § 1372(a)(1).

Plaintiff appeared in one such batch—in a spreadsheet containing the names of approximately 700 students with, per ICE's email, "positive NCIC hits." Dkt. 17 at 4, 25. ICE included Plaintiff even though that same spreadsheet confirmed that a judge had "dismissed" his speeding charge on February 21, 2019. *Id.* at 25 (cleaned up); *see* Dkt. 2-4 (Texas court's dismissal order on local district attorney's motion).

The next day, the State Department reported that it had "run the . . . data against [its] systems." Dkt. 17 at 26. It returned the entire batch of names back to ICE for SEVIS termination. *Id.*; Dkt. 18 at 14–23. Within fifteen minutes of receiving State's correspondence, an ICE official gave the "terminat[ion]" order for "all" these students' SEVIS records. Dkt. 17 at 26.

Shoddy analysis breeds shoddy results, and ICE's Initiative was no exception. It ensnared numerous students, including Plaintiff, who had no criminal history. With no warning, these students were suddenly "unable to continue their classes, research programs, and/or Ph.D. programs," and some "los[t] . . . scholarships traceable to" ICE's termination decision. *Doe 1 v. Bondi*, 785 F. Supp. 3d 1268, 1285–86 (N.D. Ga. 2025). Later, the Government conceded that thousands of students on its list were legally in status and could lawfully remain in this country. Dkt. 18 at 27.

### D. Students Sue and ICE Changes Course

Hundreds of impacted students sued in federal courts across the country. *See* Dkt. 18 at 36. Courts quickly began enjoining ICE to reactive the students' SEVIS accounts pending further litigation. Soon thereafter, ICE began "rescrubbing" the lists because some "nuances [came] about" regarding the NCIC records. Dkt. 38 at 26. State also began "reexamining various cases in a quality control measure." *Id.*

Then, on April 26, 2025, after these students had incurred (presumably hefty) legal expenses and faced academic uncertainty, ICE changed course. It internally circulated a Broadcast Message to clarify the reasons that permit ICE to terminate a nonimmigrant's SEVIS records. *See* Dkt. 16-1. ICE did *not* list appearing in the NCIC alone as a basis for termination. Soon thereafter, ICE began voluntarily restoring wrongfully terminated SEVIS records. *See, e.g.*, *Doe v. Trump*, 784 F. Supp. 3d 1297, 1310 (N.D. Cal. 2025), *modified on other grounds*, No. 25-CV-03140-JSW, 2025 WL 3295383 (N.D. Cal. Nov. 26, 2025); *Du v. U.S. Dep't of Homeland Sec.*, No. 3:25-CV-644 (OAW), 2025 WL 1549098, at *5 (D. Conn. May 31, 2025).

### E. Plaintiff Sues to Reactivate His SEVIS Record

Plaintiff was one of the many students ensnared in ICE's dragnet. On April 3, 2025, UWM notified Plaintiff that the Government had terminated his SEVIS record that day. The SEVIS portal reflected his purported "failure to maintain status" because of a "criminal records check." Dkt. 12-1 at 7 (cleaned up). The check, recall, was nothing more than his appearance in the NCIC.

Plaintiff sued, and, after an emergency hearing, the Court granted his Application for a Temporary Restraining Order. Apr. 16, 2025, Min. Order. In a later Order memorializing the decision, the Court noted that ICE had "represent[ed] that it has returned Plaintiff's [SEVIS] record . . . to the 'active' status." Dkt. 11 at 1. The Temporary Restraining Order expired on May 1, 2025.

At a subsequent preliminary-injunction hearing, ICE's counsel stated that the termination reasons in its Broadcast Message "do not apply to Mr. Patel" and that therefore, "based on the information currently available to ICE at this time, [his SEVIS record] would not be terminated absent a court order." Dkt. 18 at 37, 43. Plaintiff, however, insisted that he remains subject to

termination under the Broadcast Message.  *Id*. at 42.  Given the dispute, the Court requested that the parties propose language for a consent decree memorializing ICE's agreement to refrain from again terminating Plaintiff's SEVIS records for reasons not based in statute or regulation.  *Id*. at 44.

The parties, however, could not agree on the substance of a consent decree.  *See* Dkt. 21 at 1.  Instead, ICE moved to dismiss, arguing, among other things, that the case is moot. Plaintiff, meanwhile, requested summary judgment on his claims.  The Court heard argument on these motions on July 22, 2025.

## II.     LEGAL STANDARD

Where, as here, the Court considers APA claims on summary judgment, it sits as an "appellate tribunal."  *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999). The APA requires courts to set aside agency action that is "arbitrary, capricious," "or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  This standard of review is "narrow."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). Courts may not "substitute [their] judgment for that of the agency."  *Id*.

Rather, courts set aside agency action only where, as relevant here, the agency has "relied on factors which Congress has not intended it to consider" or failed to "articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Id*. (cleaned up).  But ICE's decision survives this scrutiny even if it is "of less than ideal clarity" so long as a court can "reasonably . . . discern[]" "the agency's path." *Finberg v. U.S. Dep't of Agric.*, 6 F.4th 1332, 1336 (D.C. Cir. 2021).

### III.    ANALYSIS

The Court first discusses its reasons for rejecting ICE's arguments that the APA's finality

provision, the Privacy Act of 1974, and Article III mootness each prevent the Court from

reaching the merits.  The Court next sets forth its reasons for agreeing with Plaintiff that ICE's

actions violated the APA.

### A.  Termination of Plaintiff's SEVIS Record Constitutes Final Agency Action

The Court joins every other federal district court to have passed on the question in

concluding that the termination of a SEVIS record constitutes "final agency action" triggering

APA review.  5 U.S.C. § 704.[9]

First, termination of Plaintiff's SEVIS record "mark[s] the consummation of the

agency's decisionmaking process."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).

ICE has claimed in related litigation that foreign students "cannot challenge the termination"

decisions.  *Isserdasani v. Noem*, No. 25-CV-283-WMC, 2025 WL 1330188, at *7 (W.D. Wis.

May 7, 2025).  And so, "there is no further agency action" for Plaintiff "to invoke or to

exhaust."  *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 958 (D.C. Cir. 2019).  To be

sure, Plaintiff could request reinstatement of his status.  *See* 8 C.F.R. § 214.2(f)(16)(ii).  But

neither statute nor regulation requires him to request reinstatement—and abide by the

---

[9] Cases in which courts have reached a similar conclusion include *Doe 1*, 785 F. Supp. 3d at 1282; *Doe*, 784 F. Supp. 3d at 1311–12; *Du*, 2025 WL 1549098, at *8; *Roe v. Noem*, No. CV 25-40-BU-DLC, 2025 WL 1382930, at *5 (D. Mont. May 13, 2025); *Doe #1 v. Trump*, No. 25 C 4188, 2025 WL 1341711, at *11 (N.D. Ill. May 8, 2025); *Vyas v. Noem*, No. CV 3:25-0261, 2025 WL 1351537, at *8 (S.D. W. Va. May 8, 2025); *Parra Rodriguez v. Noem*, No. 3:25-CV-616 (SRU), 2025 WL 1284722, at *7 (D. Conn. May 1, 2025); *Doe No. 1 v. Noem*, No. CV 25-1962, 2025 WL 1224783, at *4 (E.D. Pa. Apr. 28, 2025).  The Court is not presently aware that any court has reached an opposite conclusion.

unappealable decision made on such a request—to exhaust his administrative remedies.[10]  The

termination is therefore not "of a merely tentative or interlocutory nature."  *Bennett*, 520 U.S. at

178; *cf. Jie Fang v. Dir. U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 181–82 (3d Cir. 2019).

Second, the termination determined Plaintiff's "rights or obligations."  *Bennett*, 520

U.S. at 178.  ICE's contrary assertion that it never terminated Plaintiff's F-1 status at all, *see*

Dkt. 31 at 8–9, is a head-scratcher.  ICE concededly terminated Plaintiff's SEVIS record for

"fail[ure] to maintain status."  Dkt. 12-1 at 7 (cleaned up).  And the Government's own Foreign

Affairs Manual—which bills itself the "authoritative source" on the State Department's and

other agencies' policies[11]—confirms that SEVIS represents "the definitive record of student . . .

status."  9 Foreign Affairs Manual § 402.5-4(B).[12]

So, too, do various "legal consequences" plainly "flow" from ICE's action.  *Bennett*,

520 U.S. at 178.  Termination of a SEVIS record for failure to maintain status obligates a

student to depart from the country post haste.  8 U.S.C. § 1184(a)(1); 8 C.F.R. § 214.2(f)(5)(iv).

And the Department of Homeland Security's website advises that after the termination of a

SEVIS record for failure to maintain status, ICE may investigate the student to confirm

departure and the student loses employment authorization.[13]

---

[10] In addition, the regulation governing reinstatement appears to contemplate the student's having incurred a "violation of status," 8 C.F.R. § 214.2(f)(16)(i)(F), which does not match the fact pattern in this case.

[11] U.S. Dep't of State, *Foreign Affairs Manual* (2025), https://fam.state.gov [https://perma.cc/9K8U-SSL9].

[12] ICE also asserts that termination of a SEVIS record for failure to maintain status does not necessarily connote an actual loss of F-1 status, because ICE and school officials may terminate SEVIS records for other, routine reasons.  *See* Dkt. 31 at 9.  That contention belies the explicit reason listed in Plaintiff's SEVIS record for termination here.  *See* Dkt. 12-1 at 7.

[13] Dep't of Homeland Sec., *Terminate a Student* (May 19, 2025), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student [https://perma.cc/2TLM-9385].

For all these reasons, ICE's decision constitutes final agency action under the APA.

**B.  The Privacy Act Does Not Preclude This Action**

ICE next contends that the Privacy Act supplies an "adequate remedial mechanism" and therefore forecloses Plaintiff's APA claim.  Dkt. 31 at 9–13.  It is hard to see how.  The Privacy Act allows certain individuals who appear in an agency's "system of records" to request amendment of such records.  5 U.S.C. § 552a(d)(2)–(3).  Only U.S. citizens, lawful permanent residents, and citizens of certain designated countries may sue under the Act.  *Id*. § 552a(a)(2) & statutory note.  Plaintiff, an Indian national, may not.  *See id*.; 82 Fed. Reg. 7860 (Jan. 23, 2017).  Thus, the Privacy Act cannot afford Plaintiff any remedial mechanism, much less an adequate one.

Skirting this inconvenient fact, ICE analogizes to the D.C. Circuit's decision in *Liff v. Office of Inspector General*, 881 F.3d 912 (D.C. Cir. 2018).  There, the Circuit held that the Privacy Act supplies an "adequate" enough "remedial mechanism[]" to preclude a *Bivens* action, even though the Act did not afford the plaintiff "a complete remedy" for his alleged injuries.  *Id*. at 918, 923.  But *Liff* springs from the "disfavor[]" of judicial implication of new constitutional causes of action against federal officers.  *See Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017).  And so, the "adequate remedial mechanism[]" analysis attaches to *Bivens* jurisprudence because of the unique separation-of-powers concerns such cases raise.  *Egbert v. Boule*, 596 U.S. 482, 492, 501 (2022).  No similar constitutional issue plagues judicial review under the congressionally enacted APA.

Further, the Privacy Act does not generally "displace" operation of other statutes.  *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024).  So, for example, a plaintiff may seek similar redress for inaccurate agency records under either the Privacy Act or

the Fair Credit Reporting Act.  *Id*.  And there are no indications, as required for displacement, that Congress "intended" the Privacy Act's remedy "to be exclusive."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012).  So, following *Kirtz*'s reasoning, the Privacy Act must also complement, rather than supplant, the APA.  *Accord All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 105 (D.D.C. 2025).

Plaintiff can challenge termination of his SEVIS record under the APA.

## C. This Action Is Not Moot

This case continues to present a justiciable controversy, despite ICE's restoration of Plaintiff's SEVIS record and its averments that it does not plan to terminate that record based on his 2018 arrest.

### 1. ICE Bears the Burden of Proving Mootness

The Constitution empowers federal courts to decide only live "Cases" and "Controversies."  U.S. Const. art. III, § 2.  A court must dismiss a case as moot where a litigant has obtained "outside of litigation all the relief he might have won in it."  *FBI v. Fikre*, 601 U.S. 234, 240 (2024).  Conversely, however, a defendant may not "'automatically moot a case' by the simple expedient of suspending its challenged conduct after it is sued."  *Id*. at 241 (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)).

ICE, as the party asserting mootness here, bears a "heavy burden."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).  Its voluntary cessation of the challenged conduct does not moot this case "unless subsequent events make it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur."  *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (cleaned up) (emphasis added).  The inquiry thus hinges on the *reasonableness* of ICE's assertion that the

challenged behavior will not recur.  *See Friends of the Earth*, 528 U.S. at 189; *cf. Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1129 (D.C. Cir. 2024).

### 2.  ICE Has Not Met Its Burden of Proving Mootness

The Supreme Court's decision in *Fikre*, 601 U.S. 234, is instructive.  There, the Government had placed the plaintiff on the No Fly List for refusing to serve as an FBI informant against his own religious community.  *Id*. at 238.  Shortly after Fikre filed suit, the Government removed him from the No Fly List.  *Id.* at 239.  The Supreme Court affirmed the Ninth Circuit's reversal of the decision to dismiss Fikre's case as moot.  It explained that even though the Government had represented that it would not relist the plaintiff "based on 'currently available information,'" it had not "sp[oken] to whether the government might relist him if he does the same or similar things in the future—say, attend a particular mosque or refuse renewed overtures to serve as an informant."  *Id*. at 242; *see id*. at 243 (clarifying that the case was also not moot because "some years" had passed since Fikre's "delisting").  So too here.

ICE has not provided adequate assurances that it will not again terminate Plaintiff's SEVIS record based on currently available information.  In support of its Motion to Dismiss it has attached a letter and declaration, but neither suffices.  ICE hedged, in a May 13, 2025, letter to Plaintiff, that the April 3, 2025, termination of his SEVIS record "will not, *by itself*, be used as a basis for denial of future immigration benefits or a determination that you did not maintain your nonimmigrant status during th[e] [termination] period."  Dkt. 26-3 at 1 (emphasis added).  And the agency qualified even that statement as merely "ICE's position."  *Id*.  Similarly, the May 6, 2025, declaration of an Assistant Director of the National Security Division for Homeland Security Investigations within ICE states only that "ICE has *no plans* under its new SEVIS policy to re-terminate the plaintiff(s)['] SEVIS record based solely on the NCIC record that led to its initial termination." *See* Dkt. 26-2 ¶ 6 (emphasis added).

Nothing in these materials prevents ICE from altering its "position" or "plans" tomorrow—or terminating Plaintiff's SEVIS record based on his 2018 arrest alongside other inadequate factors. Thus, these submissions do not make "absolutely clear" that termination of Plaintiff's SEVIS record because of his dismissed speeding charge or something similarly inadequate "could not reasonably be expected to recur." *Parents Involved*, 551 U.S. at 719.

In addition, the relief ICE has purported to guarantee Plaintiff does not represent "all the relief he might have won in" this litigation. *Fikre*, 601 U.S. at 240. Plaintiff asks the Court to enjoin termination of his record not only based on his 2018 arrest, but also for any other reason "in violation of the [relevant] statute or regulations." Dkt. 28 at 9; *see* Dkt. 1 at 10. ICE has—at most—made representations only to the former. *See supra* pp. 14–15. It has not, however, asserted that a comparable future event, such as another non-criminal event that causes him to appear in the NCIC, would not again trigger such impermissible termination.

Neither has its April 26, 2025, Broadcast Message disavowed termination on such bases. Instead, that policy explicitly notes that the Student and Exchange Visitor Program, a division of ICE, "can terminate records" for, among other things, "evidence of a failure to comply with the terms of nonimmigrant status." Dkt. 16-1 at 2 (altered capitalization). That is how ICE characterized Plaintiff's appearance in the NCIC database—even though his 2018 arrest did not actually place him out of compliance. Moreover, the Broadcast Message explicitly disclaims any student's ability to "rel[y] upon" it "to create any right or benefit, substantive or procedural, enforceable at law." *Id*. at 3. Altogether, these submissions do not make "absolutely clear" that ICE will not again terminate Plaintiff's record for reasons equally unmoored from statute or regulation as his 2018 arrest. *Parents Involved*, 551 U.S. at 719.

15

Plaintiff also submitted a social-media post from White House Deputy Chief of Staff Stephen Miller on the X platform from April 2025. Miller stated, "Foreign students whose temporary visas have been terminated—and are thus here illegally—get months of 'due process' merely to be sent back home. . . . The corrupt system exists to serve everyone but Americans." Stephen Miller (@StephenM), X (Apr. 25, 2025, at 9:55 a.m. ET); *see* Dkt. 27 at 5. The email is not in the Administrative Record or necessary to the Court's decision, so the Court will not consider it to adjudicate the merits. That noted, this case belies Miller's unsupported assertions. Had the Government pursued a coherent process from the get-go, countless lawsuits would have been avoided. Foreign students were not sent home, they continued their educations and remained, as they had been, in the U.S. legally. And, today, Americans continue to benefit from their presence. *See supra* note 2.

### 3. *Moharam* Does Not Alter the Court's Analysis

*Moharam v. TSA*, 134 F.4th 598 (D.C. Cir. 2025), another No Fly List case, does not compel the Court to find this case moot. ICE contends that the D.C. Circuit held there that the possibility of repeated injurious conduct generally constitutes a "distinct legal wrong" for which a plaintiff must bring a fresh suit. Dkt. 26-1 at 18 (quoting *Moharam*, 134 F.4th at 608).

ICE's reliance on *Moharam* is misplaced. The plaintiff in *Moharam*, after his removal from the No Fly List, "expressly disclaimed seeking . . . declaratory or injunctive relief" and requested only "a classic advisory opinion." 134 F.4th at 605. That is, Moharam asked for "a judicial decision setting aside" only "the *reasoning* that animated" TSA's previous action. *Id*. In contrast, Plaintiff here asks the Court to enjoin ICE's termination *decision*. *See supra* p. 15. In addition, ICE has not shown the challenged agency action here is unlikely to recur. *Compare supra* pp. 14–16, *with Moharam*, 134 F.4th at 607–10. And while the Circuit explained in

*Moharam* that "in the national security context," a plaintiff's repeated conduct might well "constitute new intelligence" warranting legitimate, renewed agency action, 134 F.4th at 605–06 (cleaned up), here, ICE is not empowered to undertake the challenged conduct (termination of SEVIS records for reasons outside those listed in 8 C.F.R. § 214.1(d)–(g)).

*Moharam*, in short, is not as expansive as ICE contends. Indeed, if a plaintiff could not challenge any ceased conduct before it recurs, the voluntary-cessation exception to mootness would have no force. And the *Fikre* Court admonished that a case is not moot where ICE has desisted from illicit conduct only temporarily. *See* 601 U.S. at 242. Litigants who are "otherwise entitled to . . . injunctive relief remain entitled to such relief where [they] 'remain under a constant threat' that government officials will use their power to reinstate the challenged" action. *Tandon v. Newsom*, 593 U.S. 61, 63 (2021) (cleaned up).

## D. The Termination Decision Was Arbitrary or Capricious

On the merits, the Court has no trouble concluding that the disputed agency action violated the APA.

The record ICE had before it when it terminated Plaintiff's SEVIS record unambiguously contradicted its stated reasoning. ICE interpreted Plaintiff's appearance in the NCIC database as a failure to maintain his F-1 status. *See supra* pp. 6–8. But ICE reached that conclusion notwithstanding that the spreadsheet that the State Department and it reviewed acknowledges that a judge "dismissed" Plaintiff's speeding charge on February 21, 2019. Dkt. 17 at 25 (cleaned up). A dismissed speeding charge is far from a "crime[] of violence" that would place Plaintiff out of compliance with the requirements for maintaining his status. 8 C.F.R. § 214.1(g). ICE's action was therefore arbitrary or capricious, because it failed to

17

articulate "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

No other regulation authorizes termination of his SEVIS record because of his 2018 traffic violation either.  As discussed *supra* p. 4, the Government may initiate termination of status through specified pathways.  8 C.F.R. § 214.1(d).  In addition, a nonimmigrant student can fail to maintain status after, for example, engaging in unauthorized employment or providing false information to the Government, *id*. § 214.1(e)–(f).  Those circumstances do not apply to the present facts.  Accordingly, ICE impermissibly "relied on factors which Congress has not intended it to consider" in violation of the APA.  *State Farm*, 463 U.S. at 43.

Because this determination fully disposes this case, the Court need not reach Plaintiff's alternative *ultra vires* and constitutional claims.  *See Qassim v. Trump*, 927 F.3d 522, 530 (D.C. Cir. 2019).

### IV.    CONCLUSION

In sum, (1) ICE's termination of Plaintiff's SEVIS record for reasons not set forth in statute and regulation was final agency action; (2) the Privacy Act does not preclude this suit; (3) ICE has not satisfactorily established mootness under the voluntary-cessation doctrine; and (4) ICE's termination decision was arbitrary or capricious.  A separate Order will issue.


Date: February 27, 2026

_____
ANA C. REYES
United States District Judge


18